Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| CLEMENCEAU 2, LLC; ADRIEL LONGO RAVELO<br><br>Apelantes<br><br>Vs.<br><br>LIZZIE ROSSO ET ALS<br><br>Apelados | KLAN202301081 | *Apelación* Procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso Núm.: SJ2019CV06716 (804)<br><br>Sobre: Daños, Libelo, Calumnia y Difamación |
|---|---|---|

Panel integrado por su presidente, el juez Rodríguez Casillas, la juez Rivera Pérez y la juez Díaz Rivera.[1]

Rodríguez Casillas, juez ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 14 de mayo de 2024.

Comparecen ante nos la parte apelante compuesta por el *Sr. Adriel Longo Ravelo* (en adelante, "señor Longo Ravelo") y *Clemenceau 2, LLC* (en adelante, "Clemenceau"), para que revoquemos la *Sentencia* emitida el 13 de octubre de 2023 y notificada el 16 de octubre de 2023, por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, "TPI"). En dicho dictamen, se declaró *No Ha Lugar* la demanda en su totalidad y ordenó el archivo con perjuicio.

Perfeccionado el recurso de apelación, procedemos a **confirmar** la *Sentencia* apelada. **Veamos.**

-I-

El **27 de junio de 2019**, el señor Longo Ravelo y la entidad Clemenceau, **conjuntamente los apelantes**, presentaron una *Demanda* en daños por libelo, calumnia y

---

[1] Panel Especial conforme a la OATA-2023-207 del 4 de diciembre de 2023 que designa a la juez Karilyn M. Díaz Rivera para entender y votar en el presente recurso.

difamación,[2] contra: la *Sra. Lizzie Rosso* (en adelante, "señora Rosso"); el *Sr. Ángel Román Más* (en adelante, "señor Román Más"); su esposa, la *Sra. Aurora Martínez Orraca* (en adelante, "Martínez Orraca"); la *Sociedad Legal de Gananciales* compuesta por ambos (en adelante, "SLG"); *Román-Más Foundation, Corp.* (en adelante, "Román-Más Foundation"); el *Sr. John Visco Acha* (en adelante, "señor Visco Acha") y *Antilles Enterprises, Inc.*, (en adelante, "Antilles"), **conjuntamente los apelados**.

En resumen, alegaron que los apelados realizaron expresiones en común acuerdo de índole falsa y a sabiendas contra el proyecto desarrollado por la entidad Clemenceau en la construcción del Condominio Condado Blú, en el área del Condado, consistente en que: **(1)** carecía de permisos requeridos por ley; **(2)** los permisos otorgados les fueron revocados; y **(3)** ocasionó daños al ambiente y a la infraestructura de la comunidad. Dichas expresiones fueron hechas:

- El **19 de abril de 2019** a través del reportaje noticiario del Canal 2 de Telemundo;
- El **29 de abril de 2019** en el programa radial de Rubén Sánchez en la emisora WKAQ 580 AM; y
- Dos (2) publicaciones escritas, el **17 de junio de 2019** en el periódico *El Nuevo Día*; y
- El **29 de junio de 2019** en el diario *El Vocero*.

Así, el señor Longo Ravelo adujo que esas expresiones afectaron su reputación y buen nombre; además de lesionar la credibilidad del proyecto, ocasionando daños por una suma no menor de $5,000,000 por la dilación del mismo.

El **29 de marzo de 2021**, los apelados: el **señor Visco Acha**; **Antilles**; **Román-Más Foundation, Corp.**; el **señor Román Más**, su esposa, la **señora Martínez Orraca** y la **SLG** compuesta por ambos sometieron una contestación conjunta a la demanda enmendada

---

[2] El 25 de noviembre de 2020 se presentó una demanda enmendada para incluir una causa de acción de abuso del derecho. Además, el 21 de enero de 2021 se enmendó por segunda ocasión la acción instada. *Véanse,* los Anejos 3 y 4 de la *Apelación,* a las págs. 75 – 116.

para negar las imputaciones en su contra.[3] Por su parte, el **5 de abril de 2021** la **señora Rosso** también sometió su contestación.[4]

Oportunamente, **Antilles** presentó una **demanda contra tercero** dirigida a su aseguradora *MAPFRE PRAICO INS. CO.*, (en adelante, "MAPFRE"), en la que reclamó cubierta por los hechos alegados en su contra.[5] Ante la solicitud de sentencia sumaria sometida por MAPFRE y Antilles, el TPI emitió *Sentencia Sumaria Parcial* denegando el reclamo de Antilles hacia MAPFRE el **4 de junio de 2021**.[6]

Tras varios trámites, los apelados solicitaron la desestimación de la demanda,[7] pero les fue denegado mediante una *Resolución* emitida el **2 de febrero de 2022**.[8]

El **3 de febrero de 2022**, se celebró la Conferencia con Antelación al Juicio,[9] aprobándose el informe presentado el 27 de enero de 2022, como Acta que regiría los procedimientos del juicio.

El **26 de enero de 2023**, los apelantes presentaron una *Moción para que se den por Admitidas las Alegaciones no Negadas Conforme a la Regla 6.2 de Procedimiento Civil*.[10] Además, el **27 de enero de 2023** presentaron una *Moción Sometiendo Documentos Judiciales.[11]*

Así las cosas, el juicio en su fondo fue celebrado en los días **30 y 31 de enero, 1 de febrero, 2 de febrero y 3 de febrero de**

---

[3] Anejo 5 de la *Apelación*, a las págs. 122 – 129.

[4] *Id.*, a las págs. 133 – 135.

[5] Anejo 6 de la *Apelación*, a las págs. 136 – 138.

[6] Anejo 7 de la *Apelación*, a las págs. 140 – 148. Como parte de los hechos incontrovertidos estableció:

> *2. Antilles Enterprises, Inc., presentó dos solicitudes de Injunction contra Clemenceau 2, LLC. En el segundo de dichos procesos, entre otras cosas, las partes estipularon los permisos con los que cuenta Clemenceau 2, LLC., para construir los cimientos de la propiedad.*
> *3. En la propiedad de Clemenceau 2, LLC., donde se presta a realizarse el proyecto, existe un letrero instalado que identifica la entidad proponente del desarrollo, del arquitecto del proyecto e identifica el permiso de construcción en virtud del cual se realizan los trabajos.*
> Véase, Anejo 7 de la *Apelación*, págs. 141 – 142.

[7] Anejos 11 de la *Apelación*, a las págs. 195 – 280.

[8] Anejos13 de la *Apelación*, a las págs. 343 – 362.

[9] Anejo 17 de la *Apelación*, a las págs. 476 – 482.

[10] Anejo 18 de la *Apelación*, a las págs. 483 – 491.

[11] Anejo 20 de la *Apelación*, a las págs. 494 – 640.

**2023**.[12] Surge del expediente que la prueba desfilada fue la siguiente:

> *[L]a prueba testifical de la parte demandante-apelante consistió en el testimonio del codemandante, Ing. Adriel Longo Ravelo, Ing. Jorge Guerrero Miranda, y el perito económico, Antonio Fernández Pelegrina, CPA. Véase Minutas, Sumac 304, 308, 313, 314 y 315 y sus correspondientes anejos.*
>
> *Presentada la prueba de la parte demandante-apelante, los demandados-apelados argumentaron una moción de desestimación non suit al amparo de la Regla 39.2 (c) de Procedimiento Civil. Evaluadas las argumentaciones de las partes, el Tribunal se reservó el fallo y ordenó a las codemandadas a presentar su prueba.*
>
> *Las partes codemandadas-apeladas presentaron los testimonios del Ing. Juan Vázquez Muñoz, perito, John Visco, Ángel Román Mas y Lizzie Rosso.*
>
> **En relación con la prueba estipulada, se admitió lo siguiente, véase Minuta del juicio, Sumac 313, 314 y 315:**
>
> - *Exhibit 1, Resolución de consulta de construcción de la Oficina de Gerencia de Permisos, caso número 2019-268486-CCO-003768 del 17 de julio de 2020.*
> - *Exhibit 2 A-L, Totalidad del expediente certificado del Anteproyecto Número090P-02803AA-C ante la Oficina de Permisos del Municipio Autónomo de San Juan. (Sumac 301 antes Exhibit 3 de la parte codemandada, John Visco y Antilles Enterprises Inc.) (Sumac 301).*
> - *Exhibit 3 A-L, Totalidad del expediente certificado de Permiso de Construcción de Cimientos número 170P-337-331 -CX-SA ante la Oficina de Permisos del Municipio Autónomo de San Juan. (Sumac 301 antes Exhibit 4 de la parte codemandada, John Visco y Antilles Enterprises Inc.) (Sumac 301).*
> - *Exhibit 4 A-K, Totalidad del expediente certificado del Permiso de Construcción de Cimientos Número 170P-337-331 -CX-SA-E-01 ante la Oficina de Permisos del Municipio Autónomo de San Juan. (Sumac 301 antes Exhibit 5 de la parte codemandada, John Visco y Antilles Enterprises Inc.) (Sumac 301).*
> - *Exhibit 5 A-DD, Totalidad del expediente certificado del Permiso de Construcción de Cimientos número I7OP-337-331 -CX-SA-E-02 ante la Oficina de Permisos del Municipio Autónomo de San Juan. (Sumac 302 antes Exhibit 6 de la parte codemandada, John Visco y Antilles Enterprises Inc.) (Sumac 302).*
> - *Exhibit 6 A-H, Totalidad de expediente certificado de la solicitud número 180P50233AA-SA ante la Oficina de Permisos del Municipio Autónomo de San Juan. (Sumac 302 antes Exhibit 7 de la parte codemandada, John Visco y Antilles Enterprises Inc.) (Sumac 302)*
>
> **En relación con la prueba de la parte demandante-apelante, se admitió lo siguiente, véase Minuta del juicio, Sumac 304, 313 y 315:**
>
> - *Exhibit 1, Resolución de la Oficina de Permisos del Municipio Autónomo de San Juan, caso número 090P-02803AA-CO 20 de diciembre de 2012. (Sin objeción de los codemandados) (Sumac 289).*
> - *Exhibit 2, Permiso de construcción de cimientos 170P-37331CS-SA 11 de enero de 2018. (Sin objeción de los codemandados). (Sumac 289).*

---

[12] Anejos 21, 22, 23, 24 y 25 de la *Apelación,* a las págs. 641 – 645, 646 – 650, 651 – 652, 653 – 656 y 657 – 658.

- *Exhibit 3, Permiso de construcción de cimientos enmendado 17OP-37331CXSA-E-01 9 de agosto de 2018. (Sin objeción de los codemandados). (Sumac 289).*
- *Exhibit 4, Permiso de construcción de estructura Condado Blú 16 de marzo de 2021. (Sin objeción de los codemandados). (Sumac 289).*
- *Exhibit 5, Publicación de Periódico El Nuevo Día de 17 de junio de 2019. (Sin objeción de los codemandados). (Sumac 289).*
- *Exhibit 6, Publicación de Periódico El Vocero de 19 de junio de 2019. (Sin objeción de los codemandados). (Sumac 289).*
- *Exhibit 7, Transcripción de reportaje en programa radial de Rubén Sánchez en WKAQ 580AM 29 de abril de 2019. (Sin objeción de los codemandados). (Sumac 289).*
- *Exhibit 8, Reportaje en Telemundo de 19 de abril de 2019, (video). (Sumac 289).*
- *Exhibit 9, Recurso de revisión administrativa procedente de la Oficina de Gerencia de Permisos ante el tribunal de Apelaciones para el caso número 2019-268486-CCO-003768 (número KLRA202000272). (Sumac 289).*
- *Exhibit 10 (a), Sentencia dictada el 14 de diciembre de 2020 por el Tribunal de Apelaciones en el recurso de revisión judicial para el caso número 2019- 268486-CCO-003768 (número KLRA202000272). (Sumac 289).*
- *Exhibit 10 (b), Resolución dictada el 19 de marzo de 2021 por el Tribunal Supremo de Puerto Rico en la petición de Certiorari para el caso número 2019-268486-CCO-003768 (número KLRA202000272). (Sumac 289).*
- *Exhibit 10 (c), Resolución dictada el 21 de mayo de 2021 por el Tribunal Supremo de Puerto Rico en la solicitud de reconsideración para el caso número 2019-268486-CCO-003768 (número KLRA202000272). (Sumac 289).*
- *Exhibit 11 (a), Querella número 180P-50297QC-SA ante la Oficina de Permisos del Municipio de San Juan. (Sumac 289).*
- *Exhibit 11(b), Carta de 27 de diciembre de 2018 de la Oficina de Permisos del Municipio Autónomo de San Juan archivando la querella presentada por el Sr. John Visco y/o Antilles Enterprises Inc. (Sumac 289).*
- *Exhibit 11(c), Recurso de Revisión Judicial de determinación emitida por la oficina de permisos del Municipio Autónomo de San Juan en la Querella número I 8OP-50297QC-SA (número KLRA2O 1900609). (Sumac 289).*
- *Exhibit 11(d), Sentencia dictada el 31 de agosto de 2020 por el Tribunal de Apelaciones en el Recurso de Revisión Administrativa para la querella número I 8OP-50297QC-SA (número KLRA2OI 900609). (Sumac 289).*
- *Exhibit 12, Publicación en página de Facebook de Lizzie Rosso de 20 de junio de 2019. (Sumac 289).*
- *Exhibit 13, Expediente producido por el periódico El Vocero. (Sumac 289).*
- *Exhibit 14, Expediente producido por el periódico El Nuevo Día. (Sumac 289).*
- *Exhibit 15, Correo electrónico de Román Más al Departamento de Recursos Naturales de 7 de abril de 2019. (Sumac 289).*
- *Exhibit 16, Escritura número 25 de compraventa otorgada el 29 de junio de 2012 ante el notario público Christian Bernaschina Bobadilla entre Delcasse 14 Corp. y Clemenceau 2, LLC. (Sumac 289).*
- *Exhibit 17, Foto Área del Proyecto Condado Blú de 4 de mayo de 2019. (Sumac 289).*
- *Exhibit 18, Curriculum vitae CPA Alberto Fernández Pelegrina, (antes identificación 5-A) (Sumac 289).*
- *Exhibit 19, Informe pericial CPA Alberto Fernández Pelegrina, (antes identificación 5-B) (Sumac 289).*

> ***En relación con la prueba de la parte demandada-apelada, Lizzie Rosso, se admitió lo siguiente, véase Minuta de continuación de juicio, Sumac 308:***
> - *Exhibit 1, Carta de Condado Lagoon Residents in Action dirigida a Hon. Carmen Yulín Cruz, alcaldesa de San Juan con fecha de 13 de marzo de 2018, (antes identificación 2). (Sumac 290).*
>
> ***En relación con la prueba de la parte codemandada-apelada, Román Más Foundation Corp. y los esposos Mas y Martínez Orraca, se admitió lo siguiente, véase Minuta de continuación de juicio, Sumac 308:***
> - *Exhibit 1, Orden de Paralización emitida por el Departamento de Recursos Naturales y Ambientales (DRNA) el 9 de abril de 2019 por no contar con franquicia de extracción de agua para llevar a cabo la extracción de agua en los predios del proyecto. (Sumac 288).*
> - *Exhibit 2, Acuerdo transaccional número AT-19 002 A, suscrito entre Clemenceau 2, LLC y el DRNA de 17 de abril de 2019. (Sumac 288).*
> - *Exhibit 3, Curriculum vitae del hidrólogo ARM (antes identificación número 4 (Sumac 288).*
> - *Exhibit 4, Franquicia de Agua del 17 de abril de 2019, Autorización número OFA-FAID6-SJ-00240-08042019 (antes identificación 2). (Sumac 288).*
> - *Exhibit 5, Notificación y Orden del DRNA, caso número 19-090-A. (antes identificación 3). (Sumac 288).*
>
> ***En relación con la prueba de la parte codemandada-apelada, John Visco y Antilles Enterprises Inc., se admitió lo siguiente:***
> - *Exhibit 1, Resolución de Revisión Administrativa Expedita número 2018-245949-SDR-002776 emitida por la División de Revisiones Administrativas de la OGPe. (Sumac 287).*
> - *Exhibit 2, Sentencia del Tribunal de Primera Instancia, Sala Superior de San Juan en el caso número SJ2019CV04627 sobre Mandamus. (Sumac 287).*[13]

A solicitud del TPI, el **24 de marzo de 2023** las partes presentaron sendos memorandos de derecho;[14] y así, quedó sometido el caso.

El **13 de octubre de 2023**,[15] el TPI emitió una *Sentencia*,[16] en la cual, determinó que los apelados no difamaron a los apelantes, ni incurrieron en abuso del derecho al imponer múltiples reclamos y demandas. En específico, hizo ciento veintiséis (126) determinaciones de hechos,[17] que citamos *in extenso*:[18]

> **1.** *Clemenceau 2, LLC, es una compañía privada de responsabilidad limitada organizada bajo las leyes del Estado*

---

[13] Anejo 1 de la *Apelación*, a las págs. 3 – 6.
[14] Anejos 26, 27, 28 y 29 de la *Apelación*, a las págs. 659 – 667, 668 – 704, 705 – 725 y 726 – 755.
[15] Notificada el 16 de octubre de 2023.
[16] Anejo 1 de la *Apelación*, a las págs. 1 – 49.
[17] *Id.*, a las págs. 6 – 32.
[18] **Las Determinaciones de Hechos número 1-33 son las Estipulaciones a las que llegaron las partes y que surgen del Informe de Conferencia con Antelación al Juicio**. *Nota original.*

*Libre Asociado de Puerto Rico localizada en San Juan, Puerto Rico. Su dirección física y postal es la siguiente: Urb. Industrial Víctor Fernández, #340 Calle 3, Suite 1, San Juan, PR 00926-4257.*

2. *El codemandante, Ing. Adriel Longo Ravelo, es mayor de edad, ingeniero de profesión y vecino de San Juan, Puerto Rico.*

3. *La Sra. Lizzie Rosso, es una persona natural casada bajo el régimen de capitulaciones matrimoniales con Miguel Figarella. La dirección conocida de la Sra. Rosso es la siguiente: Condominio Laguna Terrace, Apt. 11-E, 6 Calle Ramírez Baiges, San Juan, PR, 00907.*

4. *Antilles Enterprises, Inc. es una corporación con fines de lucro organizada bajo las leyes del Estado Libre Asociado de Puerto Rico que, para la fecha de radicada la demanda se dedicaba, entre otros negocios, a la operación del "El Canario by the Lagoon Hotel", propiedad que fue vendida a un tercero el 28 de 7 octubre de 2021. La dirección postal de Antilles es la siguiente: PO Box 16026, San Juan, PR, 00908.*

5. *El Sr. John Visco es mayor de edad y soltero. El Sr. Visco actúa por sí y en representación de Antilles Enterprises, Inc. y, además, es el presidente de Antilles Enterprises, Inc.*

6. *El Sr. Ángel Román Más es mayor de edad, hidrólogo de profesión y está casado con Aurora Martínez Orraca, con quien mantiene una sociedad legal de gananciales. La dirección física y postal del codemandado Román es: Calle Yunque #573, Urb. Summit Hills, San Juan, PR, 00920.*

7. *Román-Más Foundation, Corp. es una corporación sin fines de lucro, debidamente organizada y creada bajo las leyes del Estado Libre Asociado de Puerto Rico con dirección física en la Calle Yunque #573, Urb. Summit Hills, San Juan, PR 00920. La dirección postal del Román-Más Foundation es PO Box 11850, MSC 582, San Juan, PR, 00922-1850.*

8. *Para el periodo objeto de las alegaciones de la demanda enmendada, Clemenceau 2, LLC era la dueña de un predio de terreno localizado en el número 14 de la Calle Delcasse y en el número 2 de la Calle Clemenceau del sector El Condado, Barrio Santurce del Municipio Autónomo de San Juan.*

9. *El 22 de febrero de 2007, Delcasse 14, Corp. presentó ante la extinta Administración de Reglamentos y Permisos ("ARPe") el anteproyecto 07AA2-CET00-01576 para la construcción de un edificio residencial multifamiliar de 23 apartamentos a erigirse en la Propiedad.*

10. *El 16 de junio de 2008, la ARPe emitió una Resolución autorizando el anteproyecto 07AA2-CET00-01576 a Delcasse 14, Corp.*

11. *El 5 de noviembre de 2009, Delcasse 14, Corp. presentó ante la Oficina de Permisos del Municipio Autónomo de San Juan (en adelante "OP-MSJ") la solicitud 09OP-02803-AA-CO para enmendar el anteproyecto 07AA2-CET00- 01576 y aumentar el número de unidades de apartamento de 23 a 56.*

12. *El 29 de junio de 2012 Clemenceau 2, LLC adquirió mediante la Escritura de Compraventa número 25 ante el notario Cristian Bernaschina Bobadilla el inmueble donde hoy ubica la construcción del proyecto Condado Blú.*

13. *El 20 de diciembre de 2016, Clemenceau 2, LLC presentó ante la OP-MSJ la solicitud 170P-37331-CX-SA para construir los cimientos del edificio propuesto en el anteproyecto 09OP-02803-AA-CO.*

14. *El 11 de enero de 2018, la OP-MSJ le expidió a Clemenceau 2, LLC el Permiso de Construcción de Cimientos 17OP-37331-CX-SA.*

15. *El 15 de mayo de 2018, la Oficina de Gerencia de Permisos (en adelante la "OGPe") emitió el "Permiso de Extracción Incidental a una Obra Autorizada por la Oficina de Gerencia de Permisos (OGPe)" 2018-215682-PCT-002632. Sujeto a la presentación del documento en evidencia.*

16. El Sr. John Visco y Antilles Enterprises, Inc., presentaron el 18 de junio de 2018 ante el Tribunal de Primera Instancia de San Juan una Petición de Injunction, Caso Civil Núm. SJ2018CV04459.

17. El 9 de agosto de 2018, a solicitud de Clemenceau 2, LLC la OP-MSJ enmendó el Permiso de Construcción de Cimientos 17OP-37331CX-SA-E-01. Sujeto a la presentación del documento en evidencia.

18. Mediante Sentencia emitida el 27 de agosto de 2018, el Tribunal de Primera Instancia, Sala de San Juan desestimó la Petición de Injunction, objeto del caso SJ2018CV04459, por no haberse agotado los procedimientos administrativos ante la pendencia de la Solicitud de Auditoría presentada ante la Junta de Planificación quien no había aun resuelto el asunto.

19. El 6 de septiembre de 2018 el Sr. John Visco y Antilles Enterprises, Inc., presentó un recurso de apelación ante el Tribunal de Apelaciones (Caso Núm. KLAN2018-00986) solicitando que revisara la sentencia del Tribunal de Primera Instancia que había desestimado la demanda.

20. El 7 de noviembre de 2018, el Tribunal de Apelaciones dictó Sentencia en el caso KLAN2018-00986 confirmando la sentencia del Tribunal de Primera Instancia y concluyendo que Antilles Enterprises, Inc., no había agotado los remedios administrativos que iniciaron con la presentación de la solicitud de auditoría ante la Junta de Planificación.

21. El 4 de diciembre de 2018 Clemenceau 2, LLC presentó ante la Oficina de Permisos del Municipio de San Juan una enmienda al anteproyecto 090P02803AA-Co para reducir el número de apartamentos propuestos de 46 a 28.

22. El 5 de diciembre de 2018 Antilles Enterprises, Inc. presentó una "Solicitud de Intervención" ante la Oficina de Permisos del Municipio de San Juan.

23. El 27 de diciembre de 2018, la Oficina de Permisos del Municipio de San Juan archivó la Solicitud de Intervención.

24. Antilles Enterprises, Inc., presentó el 5 de diciembre de 2018 una petición de Injunction ante el Tribunal de Primera Instancia, Sala Superior de San Juan, Caso Núm. SJ2018CV10480.

25. El 17 de enero de 2019, notificada el 18 de enero de 2019, el Tribunal de Primera Instancia (Caso Núm. SJ2018CV10480) dictó Sentencia desestimando la petición de interdicto ("injunction").

26. El 31 de enero de 2019, los demandados Visco y Antilles presentaron una apelación ante el Tribunal de Apelaciones (Caso Núm. KLAN2019-00113) solicitando que revocara la Sentencia emitida por el Tribunal de Primera Instancia en el caso SJ2018CV10480.

27. El 14 de febrero de 2019, el Tribunal de Apelaciones dictó Sentencia en el caso KLAN2019-00113.

28. El 22 de noviembre de 2019, el Tribunal de Primera Instancia, Sala Superior de San Juan, Caso Núm. SJ2018CV10480, dictó Sentencia Parcial.

29. El 9 de enero de 2020, el codemandado Antilles presentó otra apelación ante el Tribunal de Apelaciones (Caso Núm. KLRA0200015), cuestionando la Sentencia Parcial dictada por el Tribunal de Primera Instancia, y la misma fue confirmada el 29 de noviembre de 2021.

30. Los codemandados Antilles presentaron el 2 de octubre de 2019, una solicitud de revisión judicial de la determinación de la Oficina de Permisos del Municipio de San Juan en la Querella Núm. 180P-50297QC-SA ante el Tribunal de Apelaciones (Caso número KLRA201900609), la cual también fue desestimada por ese foro por falta de jurisdicción mediante Sentencia fechada 31 de agosto de 2020.

31. El 29 de abril de 2019 las partes codemandadas, el Sr. Visco, Sra. Rosso y Sr. Román-Mas participaron del programa radial

*de Rubén Sánchez en la emisora WKAQ 580AM. Se estipula autenticidad de la transcripción de la entrevista radial.*

32. *Se estipulan las publicaciones realizadas el 17 de junio de 2019 y 19 de junio de 2019 en los periódicos El Nuevo Día y El Vocero, respectivamente ("las Publicaciones").*

33. *El Sr. Visco y/o Antilles pagaron el costo de las Publicaciones.*

***Además de las Estipulaciones presentadas por las partes, se determinan los siguientes hechos conforme a la prueba:***

34. *El ingeniero Jorge Guerrero Miranda es ingeniero civil y se dedica al desarrollo de proyectos de construcción tanto residenciales como comerciales. Tiene experiencia en la conceptualización de desarrollo y gerencia de proyectos de proyectos. Es el vicepresidente de la parte codemandante, Clemenceau 2 LLC. Entre sus deberes y funciones se encuentra el desarrollo de proyectos, gerencia de contratos y diseño. En relación con el proyecto Condado Blú expuso que visitaba el mismo una o dos veces por semana. Mensualmente se tomaban fotos aéreas. Identificó el predio de terreno donde ubica Condado Blú y el edificio del lado izquierdo, como el Hotel El Canario. Exhibit 1 (n), demandante.*

35. *Conforme el testimonio del Ing. Guerrero Miranda, el proyecto se desarrolló en dos fases: la Fase I de construcción de cimientos y la Fase II de construcción de la torre de apartamentos y estacionamiento. Para la Fase I de construcción de cimientos, Clemenceau contó con un Permiso de Construcción aprobado y expedido el 11 de enero de 2018 por la Oficina de Permisos del Municipio Autónomo de San Juan (Núm. 17OP-37331CX-SA). Exhibit 2, parte demandante.*

36. *Posteriormente, fue enmendado por el Permiso de Construcción Núm. 17OP37331CX-SA-E-01 aprobado y expedido el 9 de agosto de 2018 para sustituir el sistema de pilotes por un "mat foundation". Exhibit 3, parte demandante.*

37. *Para la Fase II de construcción del edificio, Clemenceau contó con un Permiso de Construcción aprobado y expedido el 16 de marzo de 2021 por la Oficina de Permisos del Municipio Autónomo de San Juan (Núm. 17OP-37331CX-SAE-02). Exhibit 4, parte demandante. Para la fecha de juicio esa segunda fase no se había culminado.*

38. *Para las fechas en que los demandados hacen las expresiones públicas que se alega son difamatorias, Clemenceau tenía un permiso de construcción para la Fase 1, no así para la Fase 2. No obstante, durante ese periodo de la Fase 1, el permiso de cimientos era para 46 apartamentos y no para 26.*

39. *El Ing. Adriel Longo Ravelo, es el principal oficial de Clemenceau, y desde el comienzo de su carrera profesional en el año 1961, se ha desempeñado como ingeniero y desarrollador de proyectos de construcción hasta el presente. El Ing. Longo es el fundador de la firma de ingenieros eléctricos de Puerto Rico, Bermúdez, Longo & Díaz-Massó, así como de diversas compañías dedicadas al desarrollo y construcción de viviendas y fábricas de materiales, contando así con una reconocida y larga trayectoria profesional en la industria de la construcción en Puerto Rico.*

40. *Guerrero Miranda indicó que, para el 4 de mayo de 2019, el proyecto Condado Blú se encontraba en la etapa de construcción de cimientos, la cual consistió en el mejoramiento de suelos, que a su vez consistió en barrenar para establecer los pilotes. Para esa fecha, ese era el único trabajo que se realizaba pues era la primera fase de construcción de cimientos. Para esa fecha, tenían aprobado el permiso de construcción de cimientos, mas no tenían el permiso de construcción de la torre.*

41. *Para el mes de marzo de 2018, el Ing. Guerrero Miranda conoció a la codemandada Lizzie Rosso. El 21 de marzo de 2018 la codemandada Lizzie Rosso, acompañada de la licenciada*

*Marisol Jiménez, se reunieron con el Ing. Guerrero Miranda, la corredora de bienes raíces Shylene Cox y el codemandante, Ing. Longo en la Oficina de Ventas. En esa cita, la codemandada Rosso participó como representante de la comunidad y expuso a los ingenieros su preocupación con el desarrollo del proyecto en relación con el impacto que esto tendría para la comunidad, en particular en cuanto al tránsito y el sistema sanitario. Además, según admitido por el Ing. Longo, preguntó si el proyecto contaba con todos los endosos necesarios y permisos. Luego caminaron por el área aledaña para atender la preocupación de Rosso. Según el testimonio de Guerrero Miranda, luego de caminar el área, no identificaron ninguna de las situaciones expresadas por Rosso. En la reunión, el Ing. Guerrero Miranda expuso también el interés del desarrollador en mejorar el entorno del área, en particular se expuso la idea de mejorar el sistema de cables eléctricos y tendido telefónico para aunar esfuerzos y soterrarlos.*

42. *Conforme el testimonio del Ing. Guerrero Miranda, la señora Rosso no solicitó ver permiso alguno de la construcción en dicha reunión a pesar de que se le indicó que tenían los permisos necesarios para los trabajos que se estaban realizando en ese momento. La reunión duró alrededor de hora y media y fue una cordial.*

43. *Sobre la reunión, el Ing. Longo expuso que se le indicó a Rosso que tenían los permisos, unos preliminares y otros finales y se les informó que el proyecto sería de solo 26 apartamentos. Sin embargo, según surge de la prueba, el permiso aprobado a esa fecha era uno de cimientos para 48 apartamentos.*

44. *Luego de la reunión, Longo expresó en su testimonio que trató de comunicarse con Rosso en varias ocasiones sin éxito, por lo que la relación con la comunidad se terminó.*

45. *El Exhibit 1, estipulado, Resolución de Consulta de Construcción de la Oficina de Gerencia de Permisos, el cual autoriza la construcción de la segunda fase, contiene un detalle de los permisos y procesos administrativos, así como las enmiendas al proyecto desde su concepción.*

46. *El 4 de abril de 2018 se presentó una querella ante la Junta de Planificación por Antilles Enterprises h/n/c El Canario Hotel By The Lagoon, el condominio Le Rivage y el Condominio Laguna Terrace, en la cual se solicitó la revocación de la aprobación del anteproyecto 09OP-02803-AA-CO y del Permiso de Construcción de Cimientos.17 OP-37331-CX-SA-E-01.*

47. *Los codemandados Visco, Más y Martínez Orraca, Más Foundation y Rosso no forman parte como querellantes en dicho procedimiento administrativo.*

48. *Para el Ing. Guerrero Miranda fue una sorpresa, toda vez que dos semanas antes había tenido la reunión con la codemandada Rosso. Sin completarse dicho proceso, el 18 de junio de 2018, Antilles Enterprises h/n/c El Canario Hotel By The Lagoon, el condominio Le Rivage, condominio Del Mar, Condominio Chateau Lagoon y el Condominio Laguna Terrace presentaron un recurso de Injunction ante el Tribunal de Primera Instancia, Sala Superior de San Juan, SJ2018CV04459, en la cual se solicitó la paralización del proyecto. Dicho caso fue archivado por no haberse agotado los procedimientos administrativos. Véase Exhibit 11(a), parte demandante, Querella 18 OP-50297QC-SA ante la Oficina de Permisos del Municipio Autónomo de San Juan, presentada el 5 de diciembre de 2018. El proyecto no fue paralizado.*

49. *El único codemandado que fue parte en dicha demanda es Antilles Enterprises.*

50. *Para agosto de 2018 se había comenzado los trabajos de la primera fase. La única enmienda que se solicitó al permiso tenía que ver con un cambio en la fundación para cambiarla de pilotes a mat foundation.*

**51.** El 28 de septiembre de 2018, Clemenceau presentó ante la OP-MSJ la solicitud de permiso de construcción 17OP-37331CX-SA-E-02 para construir el edificio residencial aprobado en el anteproyecto 09OP-02803-AA-CO, pero reduciendo el número de apartamentos de 46 a 28. No obstante, el 3 de octubre de 2018, la OP-MSJ requirió a Clemenceau someter evidencia del anteproyecto que le autorizaba a reducir el número de apartamentos a 28.

**52.** El 5 de diciembre de 2018, Antilles Enterprises Inc. h/n/n El Canario by the Lagoon Hotel presentó ante la OP-MSJ la querella 18 OP-50297QC-SA. En la querella se marcó como "violación": "uso no autorizado de permiso" y "violación en permiso de construcción autorizado". En la parte descriptiva se expuso:

> Se solicita que se investiguen los hechos que a continuación se exponen:
>
> Por motivo de la ejecución de la obra de construcción de realizada para el proyecto Condado Blú, se comenzó la extracción y movimiento de terrenos en los solares colindantes a la parte demandante. La obra llevada a cabo ha eliminado toda estructura de soporte en los predios donde se está construyendo. La ejecución de la obra ha provocado que una pared ubicada dentro de los predios de los querellantes corra inminente peligro de derrumbe. Los querellantes en aras de mitigar los daños autorizaron a que se colocaran unos soportes dentro de su propiedad. El constante movimiento de los terrenos en los solares de los querellantes está causando los siguientes daños: **a.** Inminente riesgo de colapso de la verja de los querellantes; **b.** Se están socavando los cimientos de la propiedad de los querellantes; **c.** Se está causando daño estructural en el portal delantero de la propiedad de los querellantes; se ha inutilizado el acceso vehicular al predio de los querellantes que sirve de estacionamiento y área de carga de la propiedad. En estos momentos no se pueden entrar vehículos al solar; **d.** No se llevó a cabo un "Risk Management Report" al estar llevándose a cabo construcción en plena colindancia; **e.** Los solares donde se realizan las obras están constantemente inundados. A pesar de tener operando varias bombas de extracción de agua, el terreno sigue inundado y esto provoca que los cimientos de la propiedad de los querellantes se sigan socavando. Los hechos antes descritos están causando ruina en el solar de los querellantes. Está causando daños a la propiedad de los querellantes.
>
> Exhibit 11(a), parte demandante.

**53.** El 17 de abril de 2019 ante los reporteros Jorge Rivera Nieves y Luis Guardiola se transmitió un reportaje televisivo en la cadena Telemundo, canal 2, Telenoticias. Véase Exhibit 8, parte demandante. (Sumac 299). En esta fueron entrevistados, la codemandada Lizzie Rosso, como residente del Condominio Laguna Terrace, la Sra. María Jiménez, residente del Condado (quien no es parte en este pleito) y el codemandado John Visco como propietario del Hotel Canario Lagoon.

**54.** A continuación, la transcripción del reportaje de Telenoticias:

> **Sr. Jorge Rivera Nieves**
>
> Vecinos de un lujoso proyecto de apartamentos en el Condado reclamaron hoy la paralización de la obra, que, según ellos, amenaza la estabilidad social de la zona, más las estructuras existentes. Hoy Telenoticias constató los daños en varios edificios aledaños causados por la

*extracción de agua del subsuelo. Luis Guardiola con las imágenes que verás en este reportaje solo en Telenoticias.*

**Sr. Luis Guardiola**

*Desde un inicio hace más de dos años vecinos del Condominio Condado Blú se oponen a la obra, que, en su versión más reciente, tendrá 14 pisos y 28 apartamentos, ubicados en un predio de apenas 750 metros cuadrados.*

**Sra. Lissy Rosso**

*Hay una densidad enorme aquí en este pequeño pedazo y esta infraestructura es bien antigua.*

**Sr. Luis Guardiola**

*La construcción del multipisos agravaría, entre otros, el servicio de alcantarillados y el tránsito. Ellos alegan que aún sin poner un bloque aquí, la obra desarrollada por la empresa Clemenceau 2, presenta serias amenazas.*

**Sra. Lissy Rosso**

*Desde el primer día que ellos empezaron a excavar en el área, empezó a salir agua.*

**Sr. Luis Guardiola**

*El agua salobre, que brota a través del subsuelo, comenzó a llenar hace unos días la enorme fosa de los cimientos del edificio. Extraerla y depositarla en la laguna, también causa estragos.*

**Sra. María Jiménez**

*Se está teniendo también un efecto negativo estructurar en las calles y en las propiedades aledañas.*

**Sr. Luis Guardiola**

*Una de ellas es El Canario Lagoon, un pequeño hotel propiedad de John Visco, que se está hundiendo.*

**Sr. John Visco**

*Todos los expertos, inclusive los expertos de ellos han, han… han indicado que esto es peligroso en esta área, porque estos son la arena de Santurce, que es exclusivamente arena y agua.*

**Sr. Luis Guardiola**

*¿Si le saca el agua?*

**Sr. John Visco**

*Se colapsa.*

**Sr. Luis Guardiola**

*El suelo, algunas paredes y esta verja que separa su propiedad del predio a construirse comenzaron a agrietarse al mes de iniciar la excavación.*
*El efecto de la construcción en este edificio es fácilmente perceptible. Esa grieta circunvala todo el hotel. En algunos puntos puede llegar a ser hasta de una pulgada. Por aquí transcurren tuberías de todo tipo, incluso, de gas.*

*Visco demandó al desarrollador por los daños al hotel. El pleito está pendiente en el Tribunal de San Juan.*

**Sr. John Visco**

*No hemos visto permiso de construcción. No tenían permiso de, del... de sacar el agua.*

**Sr. Luis Guardiola**

*En tanto, un grupo de vecinos cuestionó los permisos otorgados y solicitó la paralización del proyecto.*
*El Tribunal les instruyó a agotar primero los procesos ante la Junta de Planificación.*

**Sra. María Jiménez**

*No les importa verdaderamente qué es lo que está sucediendo en esta área.*

**Sr. Luis Guardiola**

*En un comunicado enviado a nuestra redacción, el ingeniero Adriel Longo, Presidente de la empresa desarrolladora, aseguró que el proyecto cuenta con todos los permisos y endosos municipales y estatales. Para Telenoticias, Luis Guardiola.*

*Véase Exhibit 8, parte demandante.*

55. *El 29 de abril de 2019 se transmitió una entrevista con Rubén Sánchez en su programa radial. Las partes codemandadas, Sr. John Visco y su empresa Antilles Enterprises, Inc., la Sra. Lizzie Rosso, Marisol Jiménez[19] y el Sr. Angel Román-Más, como representantes y portavoces de la comunidad y de la Fundación Román-Más, Inc. y de lo que denominaron como "Los Vecinos de la Laguna del Condado", expresaron lo siguiente:*

**Sr. Sánchez**

*Seguro. Bienvenidos. Ustedes están aquí por una razón muy particular de una construcción que se sale de proporción a lo que resiste la zona donde ustedes viven.*

**Lizzie Rosso**

*Es correcto. Nosotros somos un grupo que nos organizamos hace ya más de un año, que estamos trabajando con varios asuntos en la comunidad, entre ellos las inundaciones que tenemos continuamente en las Calles Delcasse, Mariano Ramírez y, pues estamos bregando con toda la problemática y para empeorar la situación tenemos esta construcción de un condominio que no cuenta con los permisos y que...*

*No cuenta con los permisos. Se han otorgado unos permisos que después se han revocado. Nosotros estamos en el Tribunal, porque este proyecto no cumple con la densidad que requiere el área. Nosotros... Este es un proyecto donde es un solar de 750 metros y pretenden construir un condominio de catorce pisos...*

*Lo que permite la densidad, como esto, cosas técnicas, y aquí tenemos al ingeniero Ángel Román, que es el perito*

---

[19] La señora Marisol Jiménez no fue demandada. *Nota original.*

que está trabajando con nosotros, lo que permite este tipo de solar es una construcción de 350 por ciento del área del solar y el proyecto que ellos están proponiendo es de 753 por ciento del área del solar. En un área que está completamente, la infraestructura está comprometida...
[...]

**Sr. Sánchez**

Aledañas a la laguna, que en un periodo del año aquello sube el nivel del mar y se llena aquello allí de agua. Yo lo he visto mil veces.

**Sra. Rosso**

Mira, esto es increíble...Lo más increíble de todo es que nosotros pusimos una querella en Recursos Naturales, porque estaban extrayendo agua y echándola en la laguna y tardaron cuatro meses en contestar la querella y en nueve días le dieron el permiso, en Semana Santa, al desarrollador.
Y yo quisiera saber cómo es que Recursos Naturales, para atender una querella de esta naturaleza, donde están llevando agua a la laguna, que están extrayendo, tardan cuatro meses para responder una querella y en nueve días dan un permiso.
[...]
Y también hay un 'injunction' que está pendiente, que radicó El Canario By The Lagoon por los daños estructurales que le está causando la obra en su ejecución.

**Expresiones Sr. Visco**:

El Canario es un pequeño hotel en la Calle Clemenceau, que existe desde los 1960. Tan pronto empezó la extracción de agua, al final de septiembre del año pasado, ya para mediados de octubre habían grietas en todo el perímetro del hotel y se ha continuado desplazando y hundiéndose. Donde las grietas ya llegan al punto donde se le puede introducir la mano a la grieta.
Tenemos peritos estructurales monitoreando...

**Expresiones de Román Mas:**

Nuestra, nuestra área de, de "expertise" es el área de la hidrología y hemos estado asistiendo a los vecinos en estos asuntos de inundabilidad y, en particular, en este caso resulta que este condominio cuando se van a hacer los cimientos se encuentra en un nivel freático muy alto y tienen que empezar a bombear para poder drenar el lugar y crear los cimientos.
[...]
O sea, el área ya tiene un uso densificado que no aguanta más, pero este caso en particular, estas extracciones de aguas subterráneas que se dieron sin permiso, que se empezaron a comenzar en el año 2018 sin obtener un permiso del Departamento de Recursos Naturales.
El propósito de esas extracciones es bajar el nivel freático, al bajar el nivel freático, no solamente en su espacio, sino en las estructuras aledañas, tanto públicas, o sea, carreteras, etcétera, como los edificios que hay, ha causado una subsidencia de los suelos, lo cual a su vez crea que todos los edificios y todas las demás estructuras se empiecen a tener agrietamientos, empiecen a tener problemas estructurales. Como bien mencionaran, esto por espacio de ocho meses ocurre sin un permiso del

*Departamento de Recursos Naturales, lo traemos a la atención del departamento, el departamento tarda casi cuatro meses o más en reaccionar al asunto.*

*Más aún, el permiso que se le otorga es un permiso para 36 galones por minuto, por ocho horas de extracción. Ahora mismo ese permiso también se está violando. Las extracciones ocurren a una tasa mucho más alta que los 36 galones por minuto y las extracciones ocurren 24 horas al día, siete días a la semana. Así que, estas personas no solamente no tenían permiso en un principio, violan el permiso que incorrectamente el Departamento de Recursos Naturales y Ambientales le otorga.*

*[…]*

*La situación más crítica es el asunto este de las extracciones de aguas subterráneas que se están dando allí, porque esas extracciones están provocando serios defectos estructurales en todas las estructuras, valga la redundancia, aledañas e incluyendo la carretera, uno puede ver los hundimientos en el asfalto.*

*Así que, el departamento realmente, pues el Departamento de Recursos Naturales actuó viendo solamente una parte, supuestamente hay unos procedimientos que ellos van a implementar, pero esos procedimientos no se han implementado y no son procedimientos que vayan a ser hábil en términos de poder resolver los problemas que tenemos o de paralizar los problemas que tenemos en las estructuras aledañas.*

*Así que, de primera instancia y más importante aún, la actuación del Departamento de Recursos Naturales sobre estas extracciones de aguas subterráneas, que al final del día están siendo descargadas Condado, lo cual también implica una violación a las leyes y reglas existentes.*

*Exhibit 7, parte demandante.*

56. *En dicha entrevista se identificó al proponente del proyecto como Clemenceau LLC, siendo el proyecto Condado Blú y se informó que los entrevistados esperaban la respuesta de Recursos Naturales y la Junta de Planificación.*

57. *Posteriormente, el codemandado Antilles y John Visco presentaron un segundo recurso judicial sobre Injunction. En dicho caso solicitaron la paralización del proyecto por alegados daños causados a la propiedad de Antilles. Luego de una vista ocular, se determinó que las grietas del edificio donde ubica el Hotel El Canario eran preexistentes. El caso se archivó. Estipulación de Hechos, núm. 20.*

58. *El 17 de junio de 2019, hubo una publicación de un anuncio en el periódico el Nuevo Día y otra de 19 de junio de 2019 en el periódico El Vocero. Del mismo surge que el anuncio fue pagado por Vecinos Laguna de Condado, Exhibit 5 y 6, parte demandante. De la prueba admitida, surge que el Sr. Visco pagó por ambas publicaciones. Román Más en representación de la Fundación Román Más autorizó las publicaciones. La Sra. Rosso testificó que estuvo de acuerdo con éstas.*

59. *Del Exhibit 5, parte demandante surge que la publicación se titula "La comunidad del Condado y Fundación Protectora del Medio Ambiente Denuncian al Proyecto condado Blú y Piden a la OGPe Celebración de Vistas Públicas". En síntesis, la publicación indica se trata de vecinos del Condado que "…somos víctimas de la negligencia de las agencias del Gobierno, el Tribunal y el Municipio de San Juan; los cuales han permitido que el desarrollador Clemenceau II, LLC (Adriel Longo), construya el edificio Condado Blú, sin permisos, causando daños irreparables a la infraestructura de la comunidad y al medio ambiente. A pesar de que hemos llevado*

*nuestros reclamos a los tribunales, agencias gubernamentales y al Municipio de San Juan, los mismos han sido ignorados, mientras que la construcción de Condado Blú sigue adelante afectando cientos de familias, turistas que se hospedan en hoteles colindantes y la flora y fauna de la Laguna del Condado." La publicación expone que el proyecto fue aprobado sin autoridad del Municipio de San Juan y que era para 46 apartamentos y no 26 como se propone construir, entre otras quejas que incluye la insatisfacción del grupo con las determinaciones administrativas y judiciales.*

60. *El Exhibit 6, parte demandante surge la publicación en el periódico El Vocero, la cual el contenido es prácticamente igual y el título es "AVISO IMPORTANTE, La Comunidad del Condado y Fundación Protectora del Medio Ambiente, Denuncian al Proyecto Condado Blú y Piden a la OGPe Celebración de Vistas Públicas".*

61. *El 11 de diciembre de 2019, se emitió Sentencia Nunc Pro Tunc en el caso SJ2018CV10480. En la misma, luego de una inspección celebrada el 19 de julio de 2019, se desestimó la demanda presentada por Antilles. Todas las expresiones de los demandados fueron previas a dicha determinación judicial.*

62. *En el contrainterrogatorio, Guerrero Miranda admitió que en abril de 2019 las obras fueron paralizadas por el Departamento de Recursos Naturales y Ambientales (DRNA). **Dicha paralización se debió a que faltaba el permiso de extracción, una franquicia de agua para extraer agua subterránea. Esta situación provocó la imposición de una multa por el DRNA a Clemenceau. A su vez, dicha determinación final sobre la multa constituyó un acuerdo transaccional entre Clemenceau y el ente administrativo. Clemenceau tuvo que solicitar el permiso de franquicias de agua el 9 de abril de 2019, otorgado el 17 de abril de 2019**.[20]*

63. *Guerrero Miranda admitió que, para agosto de 2018, **cuando se comenzaron los trabajos de la primera fase, no tenía permiso de extracción de agua**. Indicó que no era requisito, aunque admitió que el DRNA paralizó la obra en abril de 2019 debido a ello. Indicó que cuando se comenzaron los trabajos para agosto a octubre de 2018, comenzó a salir mucha agua y el inspector de la obra constató que cuando se excavaba se volvía a llenar de agua. Explicó que ello es así en toda el área aledaña a la Laguna de Condado, pero que esto no implica que requiriera un permiso de extracción de agua puesto que eso no era lo que se estaba realizando. **No obstante, el DRNA requirió el permiso**.[21]*

64. *Para el 2012, Condado Blú era el único proyecto que tenía Clemenceau. En el 2016 se solicitó por primera vez el permiso de cimientos y en enero de 2018 se emite el primer permiso de apartamentos para 46 apartamentos.*

65. *Para diciembre de 2018, Clemenceau obtuvo el primer permiso basado en 46 apartamentos. Es el permiso de cimientos. **El 20 de marzo de 2018, se comenzó a hacer un esfuerzo de ventas. Para esa fecha no tenían el permiso para construir la torre, ni tampoco se estaba construyendo la misma**.[22]*

66. *El 22 de abril de 2019, el Municipio de San Juan le informó a Clemenceau que no tenía jurisdicción para evaluar el Anteproyecto de 28 apartamentos. Además, le indicó que el proyecto no cumplía con la densidad. Para esa fecha ya se había dictado Sentencia en el primer caso de Injunction.*

67. *En relación con el proceso administrativo ante la OGPe, Exhibit 1 estipulado, Guerrero Miranda admitió que la codemandada Rosso no declaró ni fue parte. Indicó que fue un procedimiento*

---

[20] *Énfasis nuestro.*
[21] *Id.*
[22] *Id.*

*en el cual se presentó prueba pericial por parte de Román Más y Clemenceau.*

68. *Shylene Cox es la corredora de bienes raíces que la parte demandante contrató para las ventas del proyecto. Para febrero de 2018 ya existía una oficina de ventas, tenían maqueta y anuncios de ventas. Existía un permiso para los cimientos y se colocó en el proyecto el letrero correspondiente con el número de proyecto y permisos. A esa fecha no había ninguna oferta por futuros compradores. Shylene Cox fue anunciada como testigo de la parte demandante, pero renunciada. No se presentó evidencia alguna de pérdida de prospectos compradores por las actuaciones de los demandados.*

69. *La primera fase de cimientos se finalizó cerca del 13 o 14 de julio de 2019. A esa fecha no podían comenzar con la segunda fase pues aún no tenían el permiso de construcción de la torre. La parte demandante no había comenzado con la construcción de la segunda fase. En enero de 2021, luego de la presentación de esta demanda, fue que se presentó el permiso para la torre de 26 apartamentos.*

70. *Al momento de las expresiones de los demandados objeto de este caso por alegada difamación, existía el permiso de cimientos que era lo que se estaba construyendo. **Sin embargo, ese permiso era para 46 apartamentos y no 26 como era la intención del desarrollador, Clemenceau**. Conforme el Exhibit 1, conjunto, la OGPe autorizó el 17 de julio de 2020 la construcción de la torre.[23]*

71. *El codemandante, Ing. Longo, tiene más de 60 años de experiencia en la industria de construcción en Puerto Rico. Desde el 2012 está retirado como ingeniero, pero continua activo en desarrollo de proyectos. Ha recibido reconocimientos en su ejecutoria profesional. Según su testimonio, previo a los incidentes que motivan esta demanda, nunca había tenido que recurrir al Tribunal por oposición a sus proyectos.*

72. *El proyecto Condado Blú se concibió originalmente en el año 2012, pero no fue hasta el 2018 que comenzaron con la obra de cimientos. Se había proyectado que la construcción terminaría en dos años y medio, alrededor del año 2021.*

73. *Longo testificó, al igual que Guerrero, que el proyecto estaba concebido en dos fases. La primera de los cimientos y la segunda, la construcción de la torre. Expuso que la construcción de cimentación tomaba tiempo, dado la calidad del suelo, por lo que había que hacerla en pilotes.*

74. *El proyecto fue financiado por Clemenceau 2, LLC y aportaciones de capital de sus socios de alrededor de 1.6 millones de dólares, más el costo de la inversión en la compra de la propiedad de $2 millones, para un total de $4.6 millones.*

75. *Longo expresó que el permiso de construcción original era para un edificio de 46 apartamentos. Sin embargo, estuvieron observando el mercado para demostrar al banco la viabilidad del proyecto y lograr su financiamiento. En ese momento decidieron modificar y cambiar el proyecto para uno de menos unidades, de 46 a 26 unidades. Explicó que 46 unidades para efectos de densidad pueden ser igual a un proyecto de 26 apartamentos, puesto que la densidad depende del tamaño del solar. Expuso que desde que obtuvieron el permiso preliminar, no hubo variaciones en cuanto al edificio, solo en cuanto a su división interna.*

76. *Sobre las publicaciones, Longo expresó que fue una sorpresa desagradable, un evento traumático y un ataque personal que ponía en entredicho su nombre y reputación. Por tanto, eso fue **"la gota que colmó la copa"** y ese día **"...decidí demandar por difamación porque era la única manera de detenerlos"**, refiriéndose a los demandados. Expuso que tuvo*

---

[23] *Énfasis nuestro.*

que dar explicaciones a colegas que le preguntaron sobre si tenía o no permisos para la obra y que nunca había estado expuesto a algo así. Longo no expresó a quiénes tuvo que dar explicaciones, ni presentó prueba sobre daños a su reputación personal o como representante de Clemenceau 2.[24]

77. En el interrogatorio directo, **Longo expuso que las dilaciones en la obra entre julio de 2019 a marzo de 2021 fueron ocasionadas por los trámites ante la OGPe, las vistas públicas y la oposición de los demandados**. Estos procedimientos tuvieron un efecto de dilatar la conclusión de la obra y encarecer la misma ante el alza en los materiales y costos de construcción.[25]

78. En el contrainterrogatorio, Longo admitió que para el 2017 el anteproyecto aprobado era de 46 apartamentos y no de 26 que era lo que estaban construyendo en su etapa de cimientos. En enero de 2018 había un preliminar aprobado para 48 apartamentos, 18.4 unidades de vivienda básica, lo que cambió fue la distribución interior de los pisos. Admitió que solicitó al Municipio de San Juan un nuevo anteproyecto para construir una torre de apartamentos en un expediente nuevo, lo cual fue denegado y, por tanto, acudió en un recurso de Mandamus al Tribunal.

79. Longo admitió que no conoce a todos los integrantes del grupo "Vecinos de la Laguna de Condado".

80. **Longo admitió que en ninguno de los procedimientos administrativos y/o judiciales se expidió una Orden de Paralización del proyecto, a excepción de la orden emitida por el DRNA, la cual paralizó el proyecto por 10 días y en la cual se llegó a un acuerdo con un pago de multa**.[26]

81. Finalmente, la Fase 2 del Proyecto fue aprobado por la OGPe.

82. Longo admitió que envió una carta a la Junta de Supervisión Fiscal, entonces lugar en el que trabajaba la codemandada Rosso, en la que solicitó una investigación contra ésta por posibles interferencias de Rosso en cuanto a la otorgación de los permisos. Desconoce el resultado.

83. Para el 2017, el proyecto Condado Blú contaba con un equipo de trabajo que consistía en el Ing. Guerrero, Fiddler & Frías como arquitectos del proyecto, Ing. Allan Cromley como consultor de suelo, Ing. Carlos Quiñones, ingeniero estructural y el Sr. Alejandro Longo.

84. En diciembre de 2017 se tomó la decisión de comenzar la venta del proyecto y se mercadeó como uno de 26 apartamentos, aunque era para un proyecto de 48 apartamentos. La obra comenzó en agosto de 2018 y contaba con el permiso de cimientos para un edificio de 48 apartamentos. **En septiembre de 2018, es por primera vez que informa que quiere cambiar el proyecto a uno de 26 apartamentos**.[27]

85. **El 3 de octubre de 2018, el Municipio de San Juan le solicitó evidencia para que someta que tiene el anteproyecto aprobado. Longo admitió que, para noviembre de 2018, el Municipio de San Juan tenía objeción a autorizar el anteproyecto**.[28]

86. **Longo admitió que había variaciones al proyecto original y por lo tanto se requería como parte del proceso de permisos la celebración de vistas públicas y la notificación a colindantes**.[29]

87. La parte demandante presentó el testimonio pericial del CPA, Alberto Fernández Pelegrina. Se estipuló su pericia como perito financiero en evaluación de daños y pérdidas económicas.

---

[24] Énfasis nuestro.
[25] Id.
[26] Id.
[27] Id.
[28] Id.
[29] Id.

*Véase Curriculum Vitae, Exhibit 18, parte demandante. Sumac 289. Fernández Pelegrina fue contratado por la parte demandante para determinar en este caso, conforme las alegaciones de las partes, los daños en pérdidas económicas sufridos por la parte demandante. Como resultado de su evaluación rindió un Informe Pericial el 30 de diciembre de 2021. Véase Exhibit 19, parte demandante. Sumac 289.*

88. *Fernández Pelegrina testificó que analizó la información suministrada por la parte demandante en cuanto al proyecto Condado Blú y qué fue lo que se proyectó y cómo culminó. Expuso que se basó en la premisa de que hubo una interrupción en la consecución del proyecto provocada por los demandados que causó retraso en la obra y por tanto daños económicos. Para ello, utilizó proyecciones a diciembre de 2022, fecha revisada para la entrega del proyecto, aunque originalmente el proyecto estaba visualizado para culminar el 20 de diciembre de 2020. Estimó los daños económicos en $ 4,729,668.22. Consideró los costos de construcción, compra del terreno, la construcción de la zapata, servicios profesionales de arquitectos e ingenieros, administración y supervisión del proyecto.*

89. *En la parte de Resumen y Conclusiones del informe del perito, se dispone:*

> *En base al análisis de la información provista y lo discutido anteriormente, a través de mi Informe es mi opinión que existe daño económico por la interferencia causado por los demandantes en este caso. Resumo los daños computados como sigue:*
>
> *1. Hay costos incurridos por la cantidad de $4,729,668.22 los que se difirió su recuperación acorde a lo proyectado originalmente por lo que he determinado un costo del dinero hasta su realización amortizada entre diciembre 2022 y abril 2023 por la cantidad de $543,911.85. Aparte de ello, de hacerse necesario extender las fechas, el interés adicional por día sería de $745.08.*
> *2. Que por el diferimiento causado de la realización de los beneficios originalmente proyectados en la cantidad de $3,735,103.10, he determinado un costo del dinero hasta su realización amortizada entre diciembre 2022 y abril 2023 por la cantidad de $429,536.86. Aparte de ello, de hacerse necesario extender las fechas, el interés adicional por día sería de $588.41.*
> *3. Que por causa de los actos de los demandados se ha hecho necesario incurrir en gastos legales y profesionales a la fecha del 31 de diciembre de 2021 por la cantidad de $529,346.63.*
> *4. Que por el uso de capital en los costos legales y profesionales por $529,346.63 he determinado un costo del dinero al 31 de diciembre de 2021 por la cantidad de $62,319.33. Aparte de ello, de hacerse necesario extender las fechas, el interés adicional por día sería de $83.39.*
> *5. Que como parte del proceso y de continuar la interferencia y afectación en la obra del proyecto de Clemenceau 2, los costos y gastos pertinentes habría que determinarlos y computar daño adicional pertinentemente. En la medida que información adicional o diferente me sea provista, la misma podría cambiar el resultado de los cómputos, ajustes y opiniones aquí determinadas.*

90. **El perito no pudo determinar que el incremento en el costo del proyecto se deba a las acciones de los demandados.** *Este expuso que asumió ese hecho y que no*

*puede determinar categóricamente que esa sea la causa y/o existan otras causas, ya que no fueron consideradas.[30]*

91. *Expuso que actualizó el día antes del juicio los cálculos de daños económicos y determinó que pueden llegar a un aproximado de 1.3 millones de dólares sin considerar la pérdida adicional del costo. Considerando que no se ha podido culminar el proyecto ello crea una merma en los beneficios, puesto que no se puede vender los apartamentos según proyectado, por tanto, ello no es determinable hasta que se concluya la obra.* **El perito admitió que no tomó en cuenta otras causas para el retraso, como lo fue la expedición de permisos, los cambios en el proyecto, la pandemia, entre otros.**[31]

92. **El perito admitió que en la Fase 1 del proyecto, no hubo retrasos**. *Sin embargo, la Fase 2 estaba proyectada para comenzar en julio de 2019 y no pudo comenzarse.* **Admitió además que para esa fecha no se tenía el permiso de construcción para la fase 2 y que se obtuvo en marzo de 2021**. *Según los documentos ambas fases debían completarse en 621 días. Sin embargo, el perito no calculó cuántos días correspondían a la Fase 1 y cuantos a la Fase 2.[32]*

93. *Fernández Pelegrina ha sido perito previamente en asuntos relacionados a la industria de la construcción y admitió que en ocasiones surgen elementos de cambio de costos y cambio de órdenes que afectan el costo proyectado originalmente del proyecto. El perito desconoce cuándo Clemenceau sometió finalmente los planos para el permiso de construcción. Tampoco consideró que la obtención de permisos y el procedimiento ante los entes administrativos toma tiempo.*

94. *El perito no calculó para efectos de la suma en daños el costo de construcción, sino el costo del préstamo de construcción. Por tanto, el análisis del perito se circunscribió a cuál es el costo para Clemenceau de recuperar la inversión.*

95. *El ingeniero Juan Miguel Vázquez Muñoz tiene licencia de ingeniero civil número 21845 y es abogado licenciado con el número 22501. Es profesional autorizado conforme la Ley 161-2009, según enmendada, lo cual le da la facultad para emitir permisos de construcción, uso y negocios como sustituto o brazo operacional de OGPe. Obtuvo dicha credencial en el 2021. Tiene experiencia con contratistas como inspector de obra, gerente y supervisor de proyectos. Testificó que el codemandado, Sr. Visco le contrató desde julio de 2019 para que rindiera una evaluación sobre el trámite de permisos de Clemenceau 2 ante la OGPe y el Municipio de San Juan. Expresó que cuando la agencia emite una Resolución aprobando un anteproyecto, eso lo que implica es que el proponente puede proceder al plano final. Por lo regular, se aprueba el plano con todos sus endosos lo cual incluye los siguientes planos: "site", arquitectónico, estructural, eléctrico, plomería, diseño interior, planos mecánicos y las "notas".*

96. *Vázquez Muñoz testificó que pudo observar el permiso de construcción de cimientos de Condado Blú, Exhibit 3 (h), Sumac 301, Permiso del Municipio de San Juan 17 OP-37331-CX-SA. Sin embargo, expuso que los "cimientos" no son una obra de construcción per se, si no parte del proyecto completo. Por ello la Resolución del Municipio dice que hay que presentar los planos completos de la fase de construcción. Los planos de todos los componentes de la obra de una edificación.*

97. *Según su análisis de los documentos y permisos ante las agencias gubernamentales,* **Vázquez Muñoz expresó que asesoró al Sr. Visco y según su análisis corroboró que esos endosos finales no existían,** *según surgía del Sistema Unificado de Información de la Oficina de Permisos. Expuso que*

---

[30] *Énfasis nuestro.*
[31] *Énfasis nuestro.*
[32] *Id.*

*pudo constatar que el proyecto tenía aprobado un plano de cimientos en pilotes, el cual fue posteriormente enmendado a uno de "mat foudation". Según su evaluación, el proyecto en relación a los permisos estaba fraccionado y ello no cumplía con las reglamentaciones. Eso fue lo que le informó al Sr. Visco.[33]*

98. *Vázquez Muñoz testificó en las vistas públicas de 8 de octubre de 2019 relativas a la consulta de construcción de Clemenceau como perito de la codemandada Antilles Enterprises. En dicho proceso se descartó su testimonio.*

99. ***La posición de Vázquez Muñoz es que el demandante no podía continuar con la construcción de los cimientos, puesto que el permiso original era para 48 apartamentos y no 26 y que habiéndose presentado un "anteproyecto" con unas variaciones, el desarrollador no podía continuar la obra hasta tanto fuera aprobado. Por tanto, su opinión profesional era que se estaba construyendo una obra sin los permisos correspondientes.[34]***

100. *Vázquez Muñoz admitió en el contrainterrogatorio que fue suspendido mientras trabajaba en la Oficina de Permisos de ARPe. Sin embargo, en el redirecto expresó que dicha investigación conllevó una auditoría y finalmente no hubo ningún señalamiento en su contra. Esto ocurrió en el 2010.*

101. *El codemandado John Visco Acha es piloto retirado desde 2017. Desde el 2001 trabaja en las empresas familiares. Para la fecha de los hechos estaba a cargo de la administración del Hotel Canario bajo Antilles Corp., colindante al proyecto Condado Blú. La construcción comenzó en septiembre de 2018 y para el 16 de octubre de 2018 comenzó a notar ciertas grietas en su edificio. Procedió a contratar peritos para la evaluación de lo que él entendía eran daños a la propiedad causados por la construcción de Condado Blú. Entre ellos, contrató a un experto en tránsito y al codemandado Angel Román Más como hidrólogo para fines de 2018. Consultó con la licenciada Porrata Doria quien le recomendó dichos peritos. Román Más le expresó que esa área se llama "las arenas de Santurce" y que cuando se extrae agua, se crea socavación, lo que a su vez puede ocasionar grietas en los edificios colindantes. También consultó al ingeniero Lavergne, experto en suelos, al ingeniero Roberto Marte, perito estructural y al ingeniero Juan Vázquez, experto en permisología. Todos esos peritos fueron recomendados por su abogada, la Lcda. Porrata Doria, que era quien le asistía en los casos y procedimientos administrativos ante las agencias de permisos. **Expuso que sus declaraciones en cuanto a que el proyecto no tenía permisos o los endosos necesarios, al igual que su declaración en cuanto a los daños al edificio, estuvo basada en las opiniones de los peritos antes consultados**. Por ello, reiteró que tales declaraciones eran su entendimiento al momento de hacer las mismas por lo que las consideraba correctas y fundamentadas en las consultas que había hecho con expertos, incluyendo consulta legal.[35]*

102. *La opinión del ingeniero Vázquez fue que **"...el anteproyecto que había no tenía los endosos que eran necesarios".[36]***

103. *Visco testificó que conocía al Ing. Longo y que todas las reuniones que sostuvieron fueron cordiales.*

104. *Admitió que participó en las publicaciones de abril de 2019 en dos periódicos. Incluso indicó que las publicaciones "...fueron ideas mías". Aunque la publicación dice pagadas por "Vecinos del Condado", Visco admitió que fueron pagadas por él. En ese momento, ante las recomendaciones de los expertos consultados entendía que se estaba construyendo sin los*

---

[33] *Énfasis nuestro.*
[34] *Id.*
[35] *Id.*
[36] *Id.*

*permisos. Admitió que el proyecto sí tenía los permisos de cimientos.*

105. *El codemandado Angel Román Más es hidrólogo con vasta experiencia y presidente de Román Más Foundation Corp. y está casado con Aurora Martínez Orraca, codemandada.*

106. *Román Más Foundation Corp., no fue parte en ningún proceso administrativo o judicial presentado contra Clemenceau.*

107. *Román Más participó como perito de Antilles Enterprises en el segundo injunction presentado por dicha parte ante el Tribunal de Primera Instancia de San Juan.*

108. *En su tiempo libre, Román Más asiste seis días a la semana a la Laguna de Condado para actividades deportivas. Además, participa de actividades para la protección de la Reserva Natural de la Laguna de Condado. Entre las actividades que realiza toma muestras de la calidad del agua, hace siembras de ostras, entre otras. Pertenece al Grupo Amigos de la Laguna.*

109. *Román Mas testificó que, en una de las ocasiones que visitó la laguna, observó que al final de la calle Decalsse, allá para octubre de 2018, había un descargue de aguas por el sistema pluvial. Se trataba de aguas claras y salubres. Procedió a caminar el área y encontró la construcción de Condado Blú. Observó a través de los paneles, aditamentos para extraer aguas subterráneas, lo cual le causó preocupación, pues podría haber descargue de dichas aguas a la laguna. Procedió al DRNA, División de Franquicias de Agua, Secretaría Auxiliar de Endosos de Permisos, ante el señor Nelson Velázquez y preguntó si estaban conscientes del proyecto y de la extracción. Luego de esa comunicación se radicó una querella en la Oficina del Cuerpo de Vigilantes. Le enseñaron el permiso de extracción de agua y reiteró su intención en que se gestionara el permiso de franquicia de agua. Explicó que cualquier extracción de aguas públicas requiere un permiso para la utilización y remoción de aguas públicas. Dicha oficina realizó una visita al proyecto.*

110. *El DRNA hizo una investigación y determinó el 9 de abril de 2019 que hacía falta dicho permiso por lo que paralizó la obra. Exhibit 1, codemandado Román Más. Sumac 288.*

111. *El 17 de abril de 2019 por acuerdo entre el DRNA y Clemenceau se impuso el pago de una multa a Clemenceau y se expidió el permiso. Exhibit 2, codemandado Román Más. Sumac 288.*

112. *El permiso otorgado a Clemenceau fue para extracción de aguas públicas número OFA-FAID 6-SJ-00240-08-042019, radicado el 8 de abril de 2019. Exhibit 4, codemandado Román Más. Sumac 288.*

113. *Ni la Fundación Román Más, ni Román Más y su esposa y sociedad legal de gananciales ha sido parte en ningún proceso judicial o administrativo a excepción de la querella que presentó ante el DRNA y que culminó con la imposición de una multa.*

114. *Román Más participó como perito en el caso administrativo para oposición del permiso de franquicias. Román Más no participó en forma alguna ante los procedimientos administrativos de permisos ante el Municipio de San Juan.*

115. *Román Más participó como perito contratado por el Sr. Visco en el caso ante el Tribunal de San Juan, Injunction, SJ2018CV0480.*

116. *Román Más admitió que fue consultado por la Lcda. Porrata Doria.*

117. **En relación con las publicaciones de los periódicos indicó que las autorizó y que se reitera que para esa fecha no tenía permisos de extracción de aguas.**[37]

118. *La codemandada Lizzie Rosso Tridas tiene un bachillerato en Administración de Empresas con concentración en contabilidad. Ha trabajado como consultora de negocios en la*

---

[37] *Énfasis nuestro.*

industria de la banca. En octubre de 2019 comenzó a trabajar en la Junta de Supervisión Fiscal en evaluación de procesos de permisos de construcción.

119. Rosso es residente del edificio Laguna Terrace desde diciembre de 2007 y preside la Junta de Titulares desde el 2012. Como miembro de la comunidad adyacente a la laguna de Condado, ha participado de reuniones que afectan a la comunidad. En particular, sobre asuntos que impactan el tráfico, inundaciones, descargas de aguas negras, entre otros. En dichas reuniones han participado diversos representantes de condominios aledaños, así como personal de los hoteles cercanos. Antes de la construcción del proyecto de Condado Blú, ya la comunidad estaba preocupada por el problema de alcantarillas tapadas, inundaciones, desborde de aguas de la laguna y tránsito.

120. Las inquietudes del grupo fueron recogidas en una comunicación que le dirigieron a la Alcaldesa de San Juan con fecha del 13 de marzo de 2018. Sumac 290, Exhibit 1, codemandada Lizzie Rosso. Entre las distintas preocupaciones del grupo, se le identificó a la Alcaldesa la construcción de Clemenceau 2, LLC. La preocupación principal del grupo de vecinos incluía la capacidad de la infraestructura del área para recibir el desarrollo de Clemenceau 2, LLC. Expresó la Sra. Rosso que uno de los asuntos tomados en consideración, fue el hecho de construcciones que habían sido publicadas en la prensa que afectaban las comunidades, tales como Paseo Caribe.

121. **En relación con el proyecto Condado Blú, la comunidad pidió asesoramiento legal y de expertos y según fueron informados, los permisos no eran correctos ni válidos**. El propósito era asegurarse que lo que se iba a construir constara con toda la infraestructura necesaria, pues entendían que la construcción amenazaba su entorno. La comunidad se unió y contrataron a la Lcda. Leonor Porrata Doria para investigar el cumplimiento del proyecto de Clemenceau 2, LLC con los requerimientos de ley. En este proceso, y por la asesoría de la Lcda. Porrata y su grupo de trabajo, el Hotel El Canario by the Lagoon, Condominio Le Rivage y Condominio Laguna Terrace presentaron la Solicitud de Auditoría ante el Municipio de San Juan el 4 de abril de 2018, así como el día 18 de junio de 2018, el Hotel El Canario by the Lagoon, Condominio Le Rivage, Condominio Laguna Terrace, Condominio Condado del Mar y Condominio Chateau Lagoon presentaron un "Injunction".[38]

122. Rosso no fue parte de los procesos judiciales. En relación con los procesos administrativos, en particular ante la querella presentada por Román Mas, "habló" por la comunidad. En cuanto a los procesos ante la OGPe, compareció como oyente.

123. En relación con las publicaciones en el periódico expuso que supo de éstas a través de la Lcda. Porrata Doria y Marisol Jiménez. Expuso que no vio la publicación hasta tanto salió en el periódico y en relación con el contenido de la misma, ella descansó en lo que le había dicho los expertos. Indicó que en su opinión no debían incluir el nombre del Ing. Longo. Sin embargo, admitió en el contrainterrogatorio que reprodujo dicha publicación en su página de Facebook.

124. En relación a la publicación de la página de Facebook, no hay prueba en autos relacionada a que por dicha publicación se haya causado daño a los demandantes.

125. En su trabajo ante la Junta de Supervisión Fiscal, Rosso se reunía con el Director de la OGPe al menos mensualmente. Tenía a su cargo la gestión de "ease of doing business" por lo que interactuaba con la OGPe. Sus funciones eran como gerente designada por la Junta para estructurar la agilización de procesos de permisos. Sobre la solicitud de investigación que

---

[38] Énfasis nuestro.

*presentó Longo contra Rosso ante la Junta de Supervisión Fiscal, luego de una investigación se determinó que la Sra. Rosso no había actuado incorrectamente. A su mejor entender, la acción del Ing. Longo contra ella fue una manera de acallar la comunidad.*

**126.** *En su testimonio, Rosso reiteró que conforme su entendimiento y basado en los peritos contratados por Visco, entendía que el proyecto no tenía los permisos. Expuso además que como miembro de la comunidad era su derecho asegurarse que la construcción contara con todos los permisos.*[39]

Inconformes, el **31 de octubre de 2023**, los apelantes sometieron una *Moción de Reconsideración y Solicitud de Enmiendas y Determinaciones de Hechos Adicionales.*[40] Al día siguiente, el TPI denegó dichas solicitudes.[41]

Inconformes aún, el **1 de diciembre de 2023**, el señor Longo Ravelo y Clemenceau acudieron ante esta Curia e imputaron la comisión de los siguientes errores:

> **PRIMER ERROR:** *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO TOMAR EN CUENTA EN SU SENTENCIA LA MOCIÓN PARA QUE SE DEN POR ADMITIDAS LAS ALEGACIONES NO NEGADAS CONFORME LA REGLA 6.2 DE PROCEDIMIENTO CIVIL PRESENTADA POR LA PARTE DEMANDANTE. [SIC.]*

> **SEGUNDO ERROR:** *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NEGARSE, PROPIAMENTE, A TOMAR CONOCIMIENTO JUDICIAL SEGÚN SOLICITADO POR LA PARTE DEMANDANTE Y CON ELLO NO TOMAR EN CONSIDERACIÓN HECHOS ESENCIALES E IMPORTANTES COMO PARTE DE SU SENTENCIA. [SIC.]*

> **TERCER ERROR:** *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL, SORPRESIVAMENTE Y MOTU PROPRIO, APLICAR LA DEFENSA DE INMUNIDAD EN LA EXPRESIÓN DIFAMATORIA CUANDO TAL DEFENSA FUE RENUNCIADA POR LOS DEMANDADOS AL NO SER PLANTEARLA [SIC.] OPORTUNAMENTE EN SUS RESPECTIVAS CONTESTACIONES A LA DEMANDA. [SIC.]*

> **CUARTO ERROR:** *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO TOMAR EN CUENTA EL INEQUÍVOCO HECHO DE QUE EN TODO MOMENTO CLEMENCEAU CONTÓ CON UN PERMISO VIGENTE PARA DESARROLLAR Y CONSTRUIR, LO QUE RESULTA CONTRARIO A LAS AFIRMACIONES FALSAS Y NEGLIGENTES DE LOS APELADOS. [SIC.]*

> **QUINTO ERROR:** *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO TOMAR EN CONSIDERACIÓN LA CRONOLOGÍA DE LOS EVENTOS DE DIFAMACIÓN Y EL HECHO DE QUE CLEMENCEAU SIEMPRE TUVO UN PERMISO VIGENTE PARA DESARROLLAR Y CONSTRUIR. [SIC.]*

---

[39] Anejo 1 de la *Apelación*, a las págs. 6 – 32.
[40] Anejo 2 de la *Apelación,* a las págs. 50 – 73.
[41] *Id.*, a la pág. 74.

*SEXTO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL INMUNIZAR ABSOLUTAMENTE A LOS APELADOS DE LAS EXPRESIONES DIFAMATORIAS BAJO EL ENTENDIDO DE QUE LAS EXPRESIONES SE REALIZARON CON EL CONSEJO DE PERITOS Y DE UNA ABOGADA, DETERMINACIÓN QUE ADEMÁS ES CONTRARIA A LA NORMA ESTABLECIDA EN MELÉNDEZ VEG V. EL VOCERO DE PR, 189 DPR 123 (2013). [SIC.]*

*SÉPTIMO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NEGARSE A VALORAR LOS DAÑOS OCASIONADOS POR LOS DISTINTOS EVENTOS DE DIFAMACIÓN E INSTANCIAS DE ABUSO DEL DERECHO PROMOVIDOS POR LOS APELADOS Y AL NO SOPESAR EL INFORME PERICIAL QUE NO FUE CONTRADICHO POR LOS APELADOS. [SIC.]*

*OCTAVO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DESCARTAR EL RECLAMO DE ABUSO DEL DERECHO Y NO TOMAR EN CUENTA LAS MÚLTIPLES INSTANCIAS PROMOVIDAS A ESOS EFECTOS POR LOS COAPELADOS JOHN VISCO Y ANTILLES. [SIC.]*

El **16 de enero de 2024**, el señor Visco Acha, en su carácter personal, y Antilles presentaron *Oposición a Recurso de Apelación*. **En la misma fecha**, Román-Más Foundation; el señor Román Más, la señora Martínez Orraca y la SLG compuesta por ambos sometieron su *Alegato en Oposición*. De igual modo, el **23 de enero de 2024** la señora Rosso presentó *Alegato en Oposición de la Parte Apelada Lizzie Rosso*; además, el día **25 de enero de 2024**, acompañó junto a una *Moción Informativa* el Apéndice e Índice de su alegato.

Por otra parte, la *Asociación de Constructores de Puerto Rico* presentó el **1 de febrero de 2024** una *Solicitud de Intervención como Amicus Curiae de la Asociación de Constructores de Puerto Rico*. La cual, declaramos **No Ha Lugar** el **6 de febrero de 2024**. Así, dimos por perfeccionado el recurso de epígrafe.

**-II-**

Examinado el tracto procesal, veamos el derecho aplicable.

**-A-**

Al revisar una determinación de un tribunal de menor jerarquía, los tribunales tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del

caso.[42] Como regla general, los foros apelativos no debemos intervenir con las determinaciones de hechos de los tribunales de primera instancia, su apreciación sobre la credibilidad de los testigos y el valor probatorio conferido a la prueba presentada en sala, pues solo contamos con *"récords mudos e inexpresivos"*.[43] Lo anterior, se fundamenta en la premisa de que el foro primario es quien tiene la oportunidad de escuchar a los testigos declarar y apreciar su *"demeanor"*.[44]

Sin embargo, la norma de deferencia antes esbozada encuentra su excepción y cede cuando la parte promovente demuestra que:

> *[h]ubo un craso abuso de discreción o que el tribunal actuó con prejuicio y parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial.*[45]

Por discreción se entiende el *"tener poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción"*.[46] No obstante, *"el adecuado ejercicio de la discreción está inexorable e indefectiblemente atado al concepto de la razonabilidad"*.[47]

A esos efectos, el Tribunal Supremo de Puerto Rico ha enumerado situaciones que constituyen un abuso de discreción:

> *[c]uando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando por el contrario el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos.*[48]

---

[42] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013).
[43] *Id.*, a las págs. 770-771.; *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009).
[44] *Colón v. Lotería*, 167 DPR 625, 659 (2006).
[45] *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).; *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689,709 (2012).
[46] *García v. Asociación*, 165 DPR 311, 321 (2005).
[47] *Id.*
[48] *Ramírez v. Policía de PR*, 158 DPR 320, 340-341 (2002).

En cambio, si la actuación del tribunal no está desprovista de base **razonable**, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso.[49] En ese sentido, las conclusiones de derecho son revisables en su totalidad por los tribunales apelativos.[50]

Ahora bien, la norma de deferencia antes esbozada no es de aplicación a la evaluación de la prueba pericial y documental. En lo que respecta a las conclusiones de hecho basadas en prueba pericial o documental, los foros revisores nos encontramos en igual posición que los tribunales sentenciadores para apreciarla y adoptar nuestro propio criterio.[51] Incluso, podemos descartarla, aunque sea técnicamente correcta.[52]

**-B-**

La protección contra ataques abusivos a la honra y reputación emana del Artículo II, Sección 8, de la Constitución de Puerto Rico,[53] además de lo establecido por el Artículo 1802 del Código Civil de Puerto Rico (1930).[54]

Bien sabemos que el objeto del derecho en la acción por difamación es la reputación personal y el buen nombre del sujeto públicamente. Por lo que el propósito de una acción por difamación es compensar al que sufre un daño en su reputación. Por lo tanto, la reclamación por difamación puede estar contenida o inmersa dentro de una acción general de daños, pero ello no agota la totalidad de los remedios provistos.[55]

La acción civil de daños y perjuicios ocasionados por

---

[49] *SLG Zapata-Rivera v. JF Montalvo*, 189 DPR 414, 434-435 (2013).
[50] *Dávila Nieves v. Meléndez Marín, supra*, a la pág. 770.
[51] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).
[52] *Id.*
[53] Art. II, Sec.8, Const. ELA, LPRA, Tomo 1.
[54] Conforme a la fecha de este caso, es de aplicación el derogado Artículo 1802 del Código Civil de Puerto Rico (1930), 31 LPRA ant. sec. 5141.
[55] *Meléndez Vega v. El Vocero de PR*, 189 DPR 123 (2013).; *Colón, Ramírez v. Televicentro de PR*, 175 DPR 690, 705-706, 726 (2009).

difamación está estatuida en la *Ley de Libelo y Calumnia.*[56] En lo referente al **libelo**, se requiere la existencia de un récord permanente de la expresión difamatoria, además de los otros elementos de la acción.[57] Por su parte, la **calumnia** se configura cuando se hace una expresión oral difamatoria, junto con los otros elementos de la acción.[58]

Así, el Tribunal Supremo de Puerto Rico, ha resuelto que cuando se hagan expresiones o publicaciones difamatorias que produzcan un daño sin que mediare malicia o alguno de los elementos para que procediera la acción de daños por difamación, siempre procedería una acción de daños y perjuicios bajo el Artículo 1802 del Código Civil (1930). Mediante esta causa de acción se tendrían que probar **todos** los elementos indispensables de dicha causa.[59]

De esta forma, la acción por difamación se ha convertido en una híbrida, pues depende de la categoría de los sujetos perjudicados. Esta continúa siendo una acción torticera intencional en cuanto a **funcionarios y figuras públicas**, y en una acción de daños y perjuicios basada en negligencia cuando el supuesto **perjudicado es una persona privada**.[60]

El daño como consecuencia de la difamación es el menoscabo de la opinión que tienen los demás sobre el valor de una persona en particular. Para que se configure, es imprescindible que la persona se entere que su **honor** ha sido perjudicado. **La publicación de la expresión falsa y difamatoria es un elemento esencial para esta causa de acción.**[61]

---

[56] *Ley de Libelo y Calumnia de Puerto Rico* del 19 de febrero de 1902, 32 LPRA secs. 3141-3149.
[57] *Ojeda v. El Vocero de PR*, 137 DPR 315, 325-326 (1994).
[58] *Id.*, a la pág. 326.
[59] *Torres Silva v. El Mundo, Inc.*, 106 DPR 415, 424 (1977).; *Romany v. El Mundo, Inc.,* 89 DPR 604, 618 (1963).
[60] *Colón, Ramírez v. Televicentro de PR, supra,* a la pág. 713.; *Ojeda v. El Vocero de PR, supra,* a las págs. 326-327.
[61] *Id.*

En otras palabras, para prevalecer en una acción por difamación, <u>el demandante no solo debe probar que cierta información publicada era de contenido difamatorio, sino que debe poder hacer la identificación de sí mismo como la persona difamada</u>. Sobre este requisito particular, se ha dicho:

> *En el ámbito de las acciones por difamación en el derecho común se ha elaborado la doctrina conocida como <u>of and concerning the plaintiff</u>, la cual requiere que en toda acción por difamación el demandante pruebe que las expresiones difamatorias se refieren a su persona de modo particular. El requisito de referencia específica o declaración "sobre el demandante y relativa al mismo" limita el derecho a demandar por falsedad injuriosa, ya que concede dicho derecho a aquellos que son objeto directo de críticas, y se lo niega a aquellos que meramente se quejan por manifestaciones no específicas que estiman que los perjudican.*
> *<u>Esta doctrina impide las reclamaciones por difamación vicaria</u> y las reclamaciones por difamaciones hechas contra grupos de personas cuando el demandante no pueda probar que él fue señalado de forma individual, es decir, que se hizo una referencia específica contra él o ella de forma particular y singularizada. (Énfasis nuestro).*[62]

Por otro lado, la acción al amparo del Artículo 1802 es más abarcadora que la acción por difamación, debido a que permite que el perjudicado —además de ser compensado por la lesión causada a su reputación y sus relaciones a la comunidad— pueda ser resarcido por otros daños como las angustias mentales y morales.[63]

Para que una persona privada pueda ser indemnizada por los daños sufridos a causa de una manifestación difamatoria **tiene** que demostrar que el demandado fue negligente —conforme a la definición establecida en los casos resueltos al amparo del Artículo 1802—. El citado artículo le impone el **<u>deber</u>** a toda persona de no causar daño a otra mediante un acto u omisión culposo o negligente. En caso de así hacerlo, la persona que produce el daño viene obligada a repararlo. En lo pertinente, el referido estatuto dispone:

---

[62] *Soc. de Gananciales v. El Vocero de PR,* 135 DPR 122, 128-129 (1994). *Citas omitidas. Énfasis nuestro.*
[63] *Colón, Ramírez v. Televicentro de PR, supra,* a las págs. 712, 714.

*"[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado"*.[64]

Según la doctrina de daños y perjuicios, todo menoscabo material o moral conlleva su reparación si concurren tres elementos básicos: **(1)** un acto u omisión culposo o negligente del demandado; **(2)** la presencia de un daño físico o emocional en el demandante y **(3)** que exista un nexo causal entre el daño sufrido y el acto u omisión.[65] La jurisprudencia ha definido el acto culposo o negligente como la falta de debido cuidado a base de la figura de la persona de prudencia común y ordinaria. La culpa consiste en no anticipar las consecuencias racionales de un acto u omisión. [66]

Con ello en mente, el Tribunal Supremo de P.R., dispuso que los <u>criterios a considerarse para determinar negligencia en la publicación de información difamatoria respecto a una persona privada son</u>: **(i)** la naturaleza de la información publicada, la importancia del asunto de que se trata y especialmente si ésta es difamatoria de su propia faz y puede preverse el riesgo de daños; **(ii)** origen de la información y confiabilidad de su fuente; y **(iii)** razonabilidad del cotejo de la veracidad de la información tomando en consideración el costo en términos de dinero, tiempo, personal, urgencia de la publicación, carácter de la noticia y cualquier otro factor pertinente.[67]

A su vez, <u>la persona que alega que ha sido lesionada en su **honor** debe establecer que el demandado publicó una expresión falsa y difamatoria sobre su persona que ha ocasionado daños</u>. Se requiere que la conducta del demandado haya violado el estándar legal de conducta aplicable a las circunstancias particulares del

---

[64] 31 LPRA ant. sec. 5141.
[65] *Nieves Díaz v. González Massas,* 178 DPR 820 (2010).
[66] *López v. Porrata Doria,* 169 DPR 135, 150-151 (2006).
[67] *Pérez v. El Vocero de PR,* 149 DPR 427, 448 (1999).; *Torres Silva v. El Mundo, Inc., supra.*

caso, ya sea malicia real o negligencia.[68] En síntesis, para que una persona privada pueda prevalecer en una acción de libelo tiene que establecer que: **(1)** la información es difamatoria y falsa, **(2)** dicha publicación se hizo de forma negligente, y **(3)** que le ha causado daños reales.[69]

### -C-

La *doctrina del abuso* del derecho que permea todo nuestro ordenamiento, así como el *principio general de la buena fe*, persiguen como finalidad impedir que el texto de una ley sea utilizado para amparar actos contrarios a la realización de la justicia y que frente al contenido ético y al espíritu objetivo de la norma legal, no prevalezcan las maniobras tendentes a lograr un resultado distinto al perseguido con ella.[70]

Es por ello que, en nuestra jurisdicción rige el principio de que una parte debe ejercer sus derechos de conformidad con las exigencias del debido proceso de ley.[71] De lo contrario, nuestro ordenamiento sanciona *"el abuso del derecho o su ejercicio antisocial"*.[72] El Tribunal Supremo de Puerto Rico acogió la doctrina del derecho civil sobre el *abuso del derecho* en *Soriano Tavárez vs. Rivera Anaya*,[73] allí afirmó que:

> *[e]l abuso del derecho, la mala fe y el fraude a la ley … persiguen … impedir que el texto de la ley sea utilizado para amparar actos contrarios a la realización de la justicia; que frente al contenido ético y al espíritu objetivo de la norma legal no prevalezcan las maniobras tendentes a lograr un resultado distinto al perseguido con ella.*[74]

### -III-

A la luz de la normativa antes expuesta, procedemos a evaluar los errores señalados en el recurso ante nuestra consideración.

---

[68] *Colón, Ramírez v. Televicentro de PR, supra*, a la pág. 726.

[69] *Pérez v. El Vocero de P.R., supra*, a la pág. 442.

[70] *Soriano Tavárez v. Rivera Anaya*, 108 DPR 663, 673-674 (1979).

[71] *Fraguada Bonilla v. Hosp. Aux. Mutuo*, 186 DPR 365, 409 (2012). *Véase, además*; *Soriano Tavárez v. Rivera Anaya, supra*, 670; *El Vocero de PR v. Hernández Agosto*, 133 DPR 413, 415 (1993).

[72] *Soriano Tavárez v. Rivera Anaya, supra*.

[73] *Id.*

[74] *Soriano Tavárez v. Rivera Anaya, supra*, a las págs. 673 – 674.

**En el primer señalamiento de error**, los apelantes alegan que erró el TPI al no tomar en cuenta en la Sentencia apelada su *Moción para que se den por Admitidas las Alegaciones no Negadas Conforme a la Regla 6.2 de Procedimiento Civil*. No tienen razón.

Surge del expediente que los apelantes no se opusieron a las enmiendas a las alegaciones en ninguna parte del *Informe de Conferencia con Antelación a Juicio,* que fue aprobado el 3 de febrero de 2022. Todavía más, dicho Informe se aprobó como Acta que regiría los procedimientos del juicio. Es decir, los apelados enmendaron aquellas alegaciones que fueron negadas por falta de información para que, entonces, fueran negadas en su totalidad. Tampoco nos convence que los hechos omitidos hubieran cambiado el resultado desestimatorio de la demanda. En ese sentido, las enmiendas a las alegaciones no les ocasionó un perjuicio indebido, ni una injusticia manifiesta al admitirse por el TPI. Correctamente, el foro *a quo* no le dio paso a las pretensiones de los apelantes de discutir en el juicio la moción presentada a menos de cinco (5) días del mismo.

**En el segundo señalamiento de error**, los apelantes arguyen que erró el TPI al no tomar conocimiento judicial, según solicitado por estos en el juicio, y con ello, obvió hechos esenciales e importantes que, como parte de la *Sentencia,* hubiese cambiado el resultado. No les asiste la razón.

Surge de la *Minuta* del 3 de febrero de 2023 que el TPI tomó conocimiento judicial de los casos SJ-2018-CV-10480 y SJ-2018-CV-04459 y sus procesos apelativos.[75] También surge de la minuta que el foro *a quo* le dio la oportunidad a las partes para presentar cualquier documento que interesen que el tribunal tenga conocimiento.[76] En su *Moción de Reconsideración y Solicitud de*

---

[75] Anejo 17 de la *Apelación*, a la pág. 479.
[76] *Id.*

*Enmiendas y Determinaciones de Hechos Adicionales,* los apelantes solicitaron que se tomara hechos específicos de esos documentos y los hiciera formar parte de su decisión. En ese sentido —alegan en su recurso de apelación ante nos— que ello hubiera cambiado el resultado del caso. No obstante, no argumentan en qué o cómo cambiaría. Tampoco contamos con una transcripción de la prueba oral que nos permita examinar las peticiones hechas por estos y los fundamentos esbozados.

**En el tercer y sexto señalamiento de error**, los apelantes aducen, en síntesis, que erró el TPI al aplicar la defensa de inmunidad en la expresión difamatoria y bajo el entendido de que las expresiones se realizaron con el consejo de peritos y de una abogada. Tampoco tienen razón.

De entrada, no surge de la *Sentencia* que se haya aplicado *prima facie* la defensa de inmunidad al desestimar la acción por difamación. Según esbozado, uno de los criterios a considerarse para determinar negligencia en la publicación de información difamatoria —respecto a una persona privada— es el origen de la información y confiabilidad de su fuente. Nótese al respecto, que el TPI desestimó la demanda, ya que, en primer orden, los apelantes no pudieron probar que las expresiones fueron hechas de manera negligente. En ese sentido —la prueba presentada y creída por la juez— demostró que las expresiones fueron hechas luego de consultar con abogados experimentados en permisos; además de expertos en suelo, estructura e hidrología. Ello ocurrió en un contexto de preocupación genuina que los apelados tenían como vecinos impactados por dicha construcción.

**En el cuarto y quinto señalamiento de error**, los apelantes arguyen, en síntesis, que erró el TPI al no tomar en cuenta el hecho de que Clemenceau siempre tuvo un permiso vigente para construir,

por lo que se demostró que las expresiones de los apelados eran falsas, difamatoria y libelosas. No tiene razón.

En primer orden, el TPI <u>sí</u> reconoció que —*al momento **(19, 29 de abril de 2019 y 17, 29 de junio de 2019)** en que los apelados hicieron sus expresiones en televisión, radio y prensa*— los apelantes tenían un permiso vigente de construcción para el cimiento del edificio de 48 apartamentos, y no para 26 apartamentos, como lo estaban mercadeando. Razón por la cual, estaban construyendo sin haber presentado un anteproyecto para enmendar dicho permiso. Ello quedó evidenciado cuando el **17 de julio de 2021** la Oficina de Gerencia de Permisos (OGPe) notificó la Resolución en la que avaló el permiso de construcción para la construcción de 26 apartamentos.

En segundo orden —y como indicamos antes— el TPI estimó que los apelantes no demostraron que las expresiones hechas por los apelados —en tv, radio y prensa— fueran negligentes, ya que estaban fundadas en consultas previas con expertos sobre este tema y, sus manifestaciones, eran producto de una preocupación genuina al estar afectados por dicha construcción. Nótese que surge del expediente que, durante los trabajos para el cimiento del edificio, comenzó a brotar y escapar una cantidad enorme de agua, lo que provocó que el Departamento de Recursos Naturales y Ambientales (DRNA) ordenara la paralización de las obras en el proyecto, ya que no se contaba con un permiso de extracción de agua emitido por dicho DRNA. Dicha paralización produjo la obtención del mencionado permiso y el pago de una multa.

**En el séptimo señalamiento de error**, los apelantes arguyen que erró el TPI al no valorar los daños ocasionados por los alegados eventos de difamación. No le asiste la razón.

En la medida en que los apelantes no prosperaron en la causa de acción sobre difamación, no procedía considerar los alegados

daños. Todavía más —tanto el testimonio del perito CPA Fernández Pelegrina como del señor Longo Ravelo— no lograron establecer los daños monetarios sufridos en el proyecto, ni al honor y perdida de reputación del señor Longo. Nada surge del expediente que demuestre lo contrario.

**Por último, en el octavo señalamiento de error**, los apelantes aducen que erró el TPI al descartar el reclamo de abuso del derecho contra el señor Visco Acha y Antilles. Tampoco tienen razón.

Surge de la prueba presentada que los apelados —en su carácter de vecinos— se opusieron al proyecto colindante del Condominio Condado Blú, en los medios administrativos y judiciales disponibles. No obstante, los apelantes no lograron demostrar que el señor Visco Acha y Antilles pretendían que la ley fuera utilizada para amparar actos contrarios a la realización de la justicia.

Por todo lo antes expuesto, los ocho (8) señalamientos de error no fueron cometidos, ya que los apelantes no demostraron que el TPI actuó con pasión, prejuicio, parcialidad o error manifiesto. Así, la Sentencia apelada es una razonable y procedemos a confirmarla.

**-IV-**

Por los fundamentos antes expuestos, resolvemos **confirmar** la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones